In re THOMAS.

THOMAS v. LURIE et al.

No. 10729.

United States Court of Appeals
Seventh Circuit.

June 15, 1953.

Michael Gesas, Leonard Gesas, Chicago, Ill., Urban A. Lavery, Chicago, Ill., Max Chill and Theodore D. Kahn, Chicago, Ill., for appellant.

Harry H. Ruskin and Joseph Rosenbaum, Chicago, Ill., for appellees.

Before MAJOR, Chief Judge, and LINDLEY and SWAIM, Circuit Judges.

MAJOR, Chief Judge.

Appellant, Richard H. Thomas, Jr., on his voluntary petition, was adjudicated a bankrupt July 31, 1936. After the usual proceedings, an order of discharge was entered June 26, 1937. The instant proceeding was instituted August 31, 1948, on the petition of appellees Samuel C. Lurie and R. L. Feltinton, alleging that they were, by assignment, creditors, that the bankrupt had failed to schedule all his property in the bankruptcy proceedings, and requesting that the order of discharge be vacated and set aside and that the bankruptcy estate be reopened for the administration of non-scheduled assets. The petition was by order referred to Honorable Wallace Streeter, a referee in bankruptcy, "to hear and determine the question as to whether there are any assets in this cause that have not been fully administered."

Thereupon, appellees (hereinafter referred to as petitioners) filed with the referee an amended petition in which the sole relief sought was the reopening of the bankruptcy proceedings and which described in more specific detail the property which the bankrupt was alleged to have concealed. Extensive hearings were conducted by the referee who heard the testimony of many witnesses and examined a great amount of documentary evidence. These hearings were participated in by petitioners as well as the bankrupt. At the conclusion, the referee made his report, including his findings of fact and conclusions of law. Subsequently, the court upon petition of the bankrupt again referred the matter to the referee for the purpose of hearing additional testimony. Further hearings were held and a supplemental report made by the referee in which his previous findings and conclusions were reaffirmed and additional findings and conclusions made. On July 9, 1952, the court entered an order overruling the objections filed by the bankrupt and confirming the report and supplemental report of the referee. The order, among other things, decreed the reopening of the bankruptcy estate, with a re-reference to the referee for the purpose of taking such further proceedings as are authorized by the Bankruptcy Act. It is from this order the appeal comes to this court.

In the view which we take of the case, there is no occasion to make a detailed narration of the voluminous testimony heard by the referee or of his findings. An examination of the record indicates that such findings are substantially

supported; in any event, there is no reason to think that they are clearly erroneous. Furthermore, the findings are not seriously challenged by the bankrupt. As subsequently disclosed, the argument here involves in the main questions of procedure, of law, or mixed questions of law and fact.

As a premise, however, for the discussion to follow, it appears appropriate to state briefly some of the salient and undisputed facts, leaving to a later point such facts as pertain to particular issues. The bankrupt scheduled liabilities of $326,875.01, and claims were allowed in the amount of $56,041.35. The petition stated that the bankrupt had no real estate except one described lot, later sold in the proceedings for $250 by order of the court, that he owned no property held in trust for him or subject to any power or right to dispose of or to charge, and the only personal property listed consisted of furniture and other items of small value claimed as exempt. The property which the bankrupt was found to have concealed and which admittedly was not scheduled as assets divides itself generally into two classes, (1) real estate and (2) fees earned as a State Court trustee but not paid to the bankrupt at the time of the filing of his petition in bankruptcy. A good portion of the testimony heard by the referee related to the real estate found to have been unscheduled and concealed. This real estate consisted of twenty-nine parcels, included in a larger number of parcels acquired in 1934 from the trustee of the Pelham Company, a bankrupt (sometimes referred to as the Pelham property) and taken in the name of Fred R. Freda and Palmera Freda. The referee found that Thomas at the time he filed his petition in bankruptcy "had a substantial interest in certain real estate and in the net profits that might arise from the sale thereof," and listed the twenty-nine separate pieces of property. The reason why this Pelham property was acquired in the name of a third party and the manner in which its ownership and control was finally traced to the bankrupt presents a rather intriguing story. It need not be told here, however, inasmuch as we accept the finding of the referee that the bankrupt owned a substantial interest in such property. The referee also found that the bankrupt had a substantial interest in a real estate mortgage which he subsequently sold for the sum of $500.

The bankrupt, on August 1, 1935, was appointed trustee of the John Blue Trust by order of the Circuit Court of Cook County, Illinois. For services rendered in such capacity the State Court, by an order entered August 18, 1939, allowed the bankrupt the sum of $3500 for continuous services rendered from August 1, 1935 to and including August 18, 1939. Admittedly this claim for services was not scheduled by the bankrupt. The referee found that the compensation for services rendered by the bankrupt between August 1, 1935 and July 27, 1936 (the date of the filing of his voluntary petition) was an asset of the estate which was concealed by his failure to schedule it.

We shall first consider the authority of a court to direct the reopening of a bankruptcy estate for the purpose of administering unscheduled assets, and we do that at this point because, in the view which we take, a proper understanding of this authority is dispositive of numerous of the issues argued on this appeal. The court's authority, or perhaps more accurately stated, its jurisdiction, is found in the Bankruptcy Act as amended in 1938, Title 11 U.S.C. § 11, sub. a, paragraph (8), wherein it is provided that a court of the United States (as a court of bankruptcy) is vested with original jurisdiction in proceedings to "reopen estates for cause shown." The words "for cause shown" were added by the amendment of 1938, and it has been held that by such amendment greater power was conferred upon a bankruptcy court in the matter of reopening estates. In re Cirillo, D.C., 102 F.Supp. 715, 717; In re Zimmer, D.C., 63 F.Supp. 488, 490. Irrespective, however, of any change intended or resulting from the amendment, it is significant that Congress prescribed no formal procedure to be followed in the reopening of an estate. The statute is silent as to the requisite cause, the manner by which or the parties

by whom "cause" may be called to the attention of the court. It is also significant that no limitation is placed upon the time when such "cause" may be shown. In Gerber v. Fruchter, 2 Cir., 147 F.2d 120, 122, the court stated, "The statutory authority for the reopening of bankruptcy estates 'for cause shown,' * * * prescribes no formal procedure; but it has become customary to grant orders for further administration *ex parte* upon a showing by affidavits. [Citing cases.]"

This court, in In re Joslyn's Estate, 7 Cir., 171 F.2d 159, had occasion to consider the matter under discussion. In that case, some eight years after the bankrupt had been discharged, a petition to reopen the proceeding was filed by the Elks Lodge, and the application was referred to a special master who reported that assets had been concealed. Based upon such report, the court ordered the estate reopened. It was argued that the Elks was not a creditor and therefore was not entitled to initiate the proceeding for reopening. In response to that contention, this court stated, 171 F.2d at page 164, "We think this argument is without merit, and this irrespective of the status of the Elks as a creditor. We see no reason why the court, when its attention was called to the fact that the bankrupt had fraudulently concealed assets, could not on its own volition have conducted an investigation or referred the matter to a Special Master, as it did, for the purpose of conducting such inquiry and making a report." We pointed out that the reopening order was not predicated upon the application made by the Elks but upon the report by the special master. We cited cases in support of the proposition that it is the duty of a bankruptcy court "to re-open closed bankruptcy estates whenever prima facie proof has been made that they have not been fully administered."

In addition to the cases which we cited in the Joslyn case, there is Schofield v. Moriyama, 9 Cir., 24 F.2d 473, 475, in which the court, after pointing out that no formal procedure was required for reopening, stated, " * * * the important requisite being only that in some competent manner

the court be convinced that there are unadministered assets belonging to the estate. It may very well be that, if so satisfied, whatever the source of the information, the court could make a reopening order *sua sponte*."

No claim is made here that our ruling on this point in the Joslyn case was erroneous; in fact, the bankrupt does not even mention the case. However, in view of the fact that the holding in that case is determinative of a number of issues which the bankrupt here argues, we have again carefully considered our previous decision. We have done this also for the reason that it is an important precedent in the administration of the Bankruptcy Act. Our further study and consideration of that case as it relates to the point under discussion convinces us that it contains a correct pronouncement.

Moreover, it has ofttimes been held that the reopening of a bankruptcy estate is a power to be exercised in the discretion of the court. As was stated in Grand Union Equipment Co., Inc., v. Lippner, 2 Cir., 167 F.2d 958, 961, "This power is exercised in the discretion of the court for cause shown unless rights of third persons have intervened which would render such a course inequitable." To the same effect, In re Butts, 2 Cir., 123 F.2d 250, 251; In re Ferribee, 7 Cir., 93 F.2d 262, 264. And in Mohonk Realty Corp. v. Wise Shoe Stores, Inc., 2 Cir., 111 F.2d 287, 289, the court stated, "A motion to reopen a bankrupt estate is addressed to the sound discretion of the district judge. This court will not review the disposition of such a motion except for abuse of discretion. [Citing cases.]"

As already observed, our holding in the Joslyn case, together with the discretionary power lodged in a bankruptcy court to reopen an estate, disposes of a number of contentions advanced by the bankrupt which may now be mentioned. It is pointed out that under Title 11 U.S.C.A. § 33, the court's jurisdiction to revoke a discharge is limited to one year, and it appears to be the contention that because petitioners in their original petition made such a request, no jurisdiction attached. Obvious-

ly, the court could not have granted the relief sought in that respect but, even so, the petition called to the attention of the court the fact, as alleged, that the bankrupt had concealed his assets from the trustee and his creditors. The court having had this situation called to its attention was authorized, in our opinion, to refer the matter to its referee as it did for the purpose of conducting a hearing and making a report relevant thereto. Moreover, petitioners subsequently filed a petition with the referee which described the alleged fraud and concealment in more detail and which made no reference to a revocation of the bankrupt's discharge. It is here asserted that only the court was empowered to entertain such a petition and that its presentation to the referee was a nullity.

In Heath v. Helmick, 9 Cir., 173 F.2d 157, the court discusses a situation wherein the petition to reopen was filed in the first instance with the referee. The court points out, 173 F.2d at page 159, that any error in the respect stated was procedural and cured by the court's approval of the referee's order recommending that the estate be reopened. And so it is in the instant situation. The manner by which the bankrupt's alleged concealment of his assets was brought to the attention of the court is now water over the dam. It is now sufficient to note that the court was placed on notice, and in the exercise of its discretion referred the matter to its referee for a hearing and report, and it is well to keep in mind that the order of reopening now complained of is that of the court and not of the referee.

■ The bankrupt also contends that there is a two-year limitation period for the reopening of bankruptcy estates imposed by § 29, sub. d, Title 11 U.S.C.A., which provides, "Suits shall not be brought against a person who has acted as a receiver or trustee of a bankrupt estate, upon any matter arising in connection with the administration thereof, subsequent to two years after the estate has been closed." Great stress is placed by the bankrupt upon Kinder v. Scharff, 231 U.S. 517, 34 S.Ct. 164, 58 L.Ed. 343. A study of that case reveals that it is without application.

It is rather obvious, we think, from a reading of the statutory provision lastly quoted that it is not relevant to a proceeding to reopen a bankruptcy estate. It has been so held in In re Schreiber, 2 Cir., 23 F.2d 428, 429; Stanolind Oil & Gas Co. v. Logan, 5 Cir., 92 F.2d 28, 31; Tuffy v. Nichols, 2 Cir., 120 F.2d 906, 908. See also Traer v. Clews, 115 U.S. 528, 6 S.Ct. 155, 29 L.Ed. 467, and Exploration Co. v. United States, 247 U.S. 435, 448, 38 S.Ct. 571, 62 L.Ed. 1200.

■ The bankrupt advances another contention which we think is rendered untenable by our decision in the Joslyn case. It is argued that petitioners (appellees) were not shown to have been assignees and, therefore, were not proper parties to a reopening petition. This theory envisions a proceeding adversary in its nature, which we think it is not. Therefore, cases upon which the bankrupt relies, which hold that an assignee must properly allege and prove a valid assignment in order to maintain a cause of action, are without application. Applying our holding in the Joslyn case, it would seem inconsequential whether petitioners were assignees in the legal sense. It is sufficient if the matter of fraudulent conduct on the part of the bankrupt, or concealment of assets on his part, is brought to the attention of the court. When that was done, the court was under no obligation to ascertain the precise standing of petitioners but was authorized in its discretion to refer the matter to a referee for investigation. Whether petitioners are bona fide assignees will become important when they attempt, as they no doubt will, to participate in the concealed assets or the proceeds thereof.

■■ Another contention advanced by the bankrupt with some plausibility is that the original trustee abandoned the assets now in dispute and that title thereto was revested in the bankrupt. There can be no denial of the principle of law that a trustee in bankruptcy is not obliged to accept, and may abandon, onerous assets which the bankrupt has disclosed and surrendered, and that upon such abandonment, title thereto revests in the bankrupt. The question is whether that principle is ap-

plicable to the facts of the instant case. It is upon this issue that the court referred the matter to the referee for a second time so that the bankrupt might offer the testimony of Earl Stewart, an attorney who represented Abraham Simon, the trustee in the original proceeding. Stewart was examined at great length, and his honesty, integrity and ability are hardly open to question. However, he was severely handicapped from the fact that he testified mostly from memory concerning his work as attorney for the trustee some fifteen years previously. We have read his testimony carefully and about the most that can be said for it is that it raises a question as to whether the specific assets were ever seriously considered by him or the trustee as being the property of the bankrupt. If so, he was left in the dark as to what the true fact was because he was met by the sworn testimony of the bankrupt and a man by the name of Ryan that the assets acquired from the Pelham estate were owned by the latter. Certainly we cannot hold that the finding of the referee on this aspect of the case is clearly erroneous. Referring to the testimony of the bankrupt and Ryan concerning the property in controversy, given on that occasion, the referee found that they "concealed the same by testifying falsely that the bankrupt was only working for Ryan in the sale and management of, and had no interest in, said properties; and further finds that there was not available to the Trustee in Bankruptcy at or prior to the time of the closing of the bankrupt's estate and of the said Trustee's discharge, any proof or evidence to disclose or establish the bankrupt's actual legal or equitable interest in the bankrupt's unadministered property so concealed and the falsity of the sworn testimony of the said bankrupt and Ryan by them given as aforesaid."

The bankrupt attempts to show, without success, that there was an express abandonment of the property now in dispute by the former trustee. About the most which can be said of the records relied upon in this respect is that they create some confusion. It apparently is true that the trustee and his attorney, Stewart, had an inkling or suspicion that the bankrupt owned property other than that listed in his schedules, and that some investigation was made. Much reliance is placed upon a statement in the trustee's final report, "that if no adequate bid or bids are received for same, your trustee be authorized to abandon same, that therefore said estate is now ready to be closed." This report of the trustee was approved by the court and it is argued that this shows an abandonment of the very property now in controversy. We do not agree. It is quite plain, so we think, that the trustee was seeking to abandon scheduled, not unscheduled, property. In fact, it is not discernible how the trustee could abandon property which he failed to find was that of the bankrupt and ownership of which the bankrupt stoutly denied.

We need not attempt a detailed analysis of the many cases relative to the law of abandonment pronounced under a variety of circumstances. The principal cases relied upon by the bankrupt are Sparhawk v. Yerkes, 142 U.S. 1, 12 S.Ct. 104, 35 L. Ed. 915; Dushane v. Beall, 161 U.S. 513, 16 S.Ct. 637, 40 L.Ed. 791; Brown v. O'Keefe, 300 U.S. 598, 57 S.Ct. 543, 81 L. Ed. 827; In re Webb, 4 Cir., 54 F.2d 1065; In re Ferribee, 7 Cir., 93 F.2d 262, 263; and In re Malcom, D.C., 48 F.Supp. 675, There is at least one ground, however, which distinguishes all of these from the instant case, that is, the trustee or the court was dealing with a situation wherein the bankrupt had scheduled the asset which the trustee found worthless and abandoned. There is no case, so far as we are aware, which has sustained an abandonment by a bankruptcy trustee of non-scheduled property, the ownership of which was denied or concealed by the bankrupt. A pertinent observation is contained in First National Bank of Jacksboro v. Lasater, 196 U.S. 115, 118, 25 S.Ct. 206, 208, 49 L.Ed. 408, wherein the court stated: "We have held that trustees in bankruptcy are not bound to accept property of an onerous or unprofitable character, and that they have a reasonable time in which to elect whether they will accept or not. If they decline to take the property, the

bankrupt can assert title thereto. [Citing cases.] But that doctrine can have no application when the trustee is ignorant of the existence of the property, and has had no opportunity to make an election. It cannot be that a bankrupt, by omitting to schedule and withholding from his trustee all knowledge of certain property, can, after his estate in bankruptcy has been finally closed up, immediately thereafter assert title to the property on the ground that the trustee had never taken any action in respect to it."

As already noted, it is hardly conceivable that a trustee could abandon property which he did not claim and which never came into his possession or, conversely, that a bankrupt could, by the process of abandonment on the part of a trustee, become revested with title to property, the ownership of which he denied at that time and, for that matter, denies at this time. The bankrupt's contention that this property was abandoned by the trustee must be rejected.

 The bankrupt also argues `that petitioners have been guilty of such laches as to estop them from seeking a reopening of the estate. The authority cited in support of this contention is meager and carries little weight. The sole case cited which involved bankruptcy is that of In re Fair Creamery Co., 6 Cir., 193 F.2d 5. In that case, it appears that a plan of arrangement was confirmed by a referee to whom the matter had been referred, and the estate closed. Some seven years later it was charged by certain creditors that the referee had been guilty of fraud, and it was sought to reopen the estate. The court stated, 193 F.2d at page 7: "These facts are clear evidence of laches. The receiver is dead. Appellants attack the regular orders of the referee and charge fraud against the deceased receiver. The injustice of reopening the case because of evidence which can no longer be explained or denied is self-evident." Two cases are cited in support of this statement, Hanner v. Moulton, 138 U.S. 486, 11 S.Ct. 408, 34 L.Ed. 1032, and Abraham v. Ordway, 158 U.S. 416, 15 S.Ct. 894, 39 L.Ed. 1036, neither of which pertains to bankruptcy.

Assuming that the rule thus announced is sound as applied to the facts of that case, we think it has no relevancy here. There, the charge of fraud was made not against the bankrupt but against a deceased receiver. Here, the charge is made against the bankrupt and, insofar as the right to reopen is concerned, there is no showing or indication that the rights of any third party have intervened.

The bankrupt stresses that a bankruptcy court is one of equity, with which we agree. It is horn-book law, however, that a person who seeks the protection of equity must do equity. To recognize the defense in the instant situation would mean that a bankrupt who was successful in concealing property from his creditors would finally be exonerated under this equitable doctrine, and the longer the concealment, the more certain would be his escape. Again we think this argument misconceives the nature of the proceeding. As we have noted, this is not an adversary proceeding, with petitioners on one side and the bankrupt on the other. The petitioners merely serve as a conduit by which the attention of the court is called to a situation which authorizes a reference on the issue as to whether the estate should be reopened. And while petitioners have carried the burden of convincing the court that such is the situation, it is the creditors as a whole, not merely the petitioners, who have, by the concealment of assets, been deprived of their rights. To sustain the bankrupt's contention relative to the doctrine of laches would in reality invoke the doctrine against the court and all the creditors of the bankruptcy estate. While we find little aid in the books, the contention does not square with our sense of fairness and justice.

 It should be remembered that the bankruptcy law is for the benefit of distressed debtors, whereby they may obtain a discharge of their debts. It presupposes, however, that one who seeks its protection will deal honestly and fairly with his creditors by furnishing a complete and accurate schedule of his assets. A failure to do this, if intentional, is a fraud, the perpetrator of which is in a poor position

to seek protection on a basis of equity. If the result be harsh to the bankrupt, it is because he has become the victim of his own handiwork. At the same time, we are not disposed to shed any tears of sympathy on behalf of the petitioners. No doubt it is true, as charged, that they became assignees of their claims by purchase for a trifling sum but, even so, that does not change the legal aspects of the situation. After all, they brought to the court the notice which, upon proper investigation, disclosed, as found by the referee, that the bankrupt had perpetrated a fraud by failure to schedule his assets and by their concealment.

We have heretofore stated the facts relative to the fees which the bankrupt received as trustee of the John Blue Trust pending in the State Court. As already noted, on August 18, 1939, he was allowed by that court $3500 as compensation for services rendered, commencing August 1, 1935. Thus, the fee allowed covered a period of almost one year prior to his petition in bankruptcy (July 27, 1936) and for the period of three years subsequent thereto. In our judgment, the finding and conclusion of the referee that the compensation thus allowed him for services as trustee, or any part thereof, passed to the trustee in bankruptcy, is erroneous. The portion of the fee which was earned prior to his petition in bankruptcy was not found, and an attempt to do so could only result in speculation and uncertainty. It could be that the major portion of the services rendered was prior to bankruptcy and, on the other hand, it could be that a major portion was rendered after bankruptcy. In other words, there is no way of determining what, if any, compensation was due him as trustee at the time he filed his petition in bankruptcy.

It is conceded by the petitioners that there are no controlling decisions in this jurisdiction. Both sides cite cases from other jurisdictions in support of their respective contentions. Without attempting to analyze and distinguish such cases, we think it is sufficient to note that a public official was not involved in those relied upon by petitioners, such as a court trustee whose salary or compensation was undetermined at the time of bankruptcy. More in point are In re Furness, 2 Cir., 75 F.2d 965, and Shannon v. Bruner, C.C., 36 F. 147. In the former case, the court stated, 75 F.2d at page 966: "The possibility of an allowance for services which this bankrupt then had by virtue of his having served as a testamentary trustee was neither property nor a property right at least until his fees were unconditionally earned in the sense that they were no longer dependent upon his future conduct. [Citing cases.] Merely acting as such a trustee is not enough. He must account properly before he is entitled to a cent." The question involved in the Shannon case was the right of a public officer to make an assignment of compensation in advance of its receipt. The reasoning of the court is equally applicable here. The court, by Judge Brewer (afterward a member of the Supreme Court) stated, 36 F. at page 148: "Now, can an officer make an assignment in advance of his fees or his salary? The law is very clear that he cannot. Public policy has affirmed the necessity of securing to every public officer, when earned, his fees or his salary, unhindered by any present legal attack or any previous voluntary assignment."

Our holding that the referee erred on this phase of the case does not require a reversal, as urged by the bankrupt. This item represents only a small portion of the unadministered assets as found by the referee. There is no reason to think that the order directing that the estate be reopened is dependent upon the referee's erroneous conclusion on this phase of the case.

In conclusion, we think there may be some merit in the bankrupt's contention that the referee in certain respects exceeded his authority. Assuming that such is the case, we see no reason why it should affect this decision. As previously noted, the matter was referred to the referee "for hearing and determination of the question as to whether there are any assets in this cause which have not been fully administered." Petitioners in their brief state that there are two contested issues, (1) Did the

court below commit error in its "approval and adoption of the Referee's reports and his findings of fact and conclusions of law, in reopening the Bankrupt's closed estate?" and (2) "Was there error as a matter of law in reopening the Bankrupt's closed estate based upon the findings of fact as made?" Thus, the issue presented to this court is squarely within the scope of the order by which the matter was referred to the referee, and our decision is limited to an affirmance of the order which directs the reopening of the estate. It is not our purpose to outline the future procedure to be employed or to anticipate legal questions which may arise in connection therewith. The referee in the order appealed from is directed "to take such further proceedings herein as are required and permitted by Act of Congress relating to bankruptcy," and we assume that such will be done.

The order appealed from is

Affirmed.